# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

|                          |     |                             |
|--------------------------|-----|-----------------------------|
| **KAYLA BAYLES,**        | )   |                             |
|                          | )   |                             |
| **Plaintiffs,**          | )   |                             |
| **vs.**                  | )   | **Case No.  16-cv-106-GKF-JFJ** |
|                          | )   |                             |
| **RICHARD GREEN,** *et al.,* | ) |                           |
|                          | )   |                             |
| **Defendants.**          | )   |                             |
|                          | )   |                             |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Thomas Mortensen, OBA # 19183
1331 S. Denver Ave.
Tulsa, OK 74119
(918) 392-9992
(918) 392-9993 - Fax
tmort70@hotmail.com
*and,*
Patrick L. Adams, OBA # 19302
Adams Law Office, PLLC
525 S. Main, Suite 525
Tulsa, OK 74103
(918) 587-8700
patrick.adams@padamslawok.com
*Attorneys for Plaintiff*

# TABLE OF CONTENTS

TABLE OF CASES & LEGAL AUTHORITIES ............................................................ i

PLAINTIFF'S RESPONSES TO DEFENDANT'S STATEMENT
OF UNCONTROVERTED FACTS ............................................................................ 1

PLAINTIFF'S STATEMENT OF MATERIAL FACTS ("PSMF'S")
THAT WOULD PRECLUDE DEFENDANT'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ........................................................................................ 3

ARGUMENTS & AUTHORITIES ......................................................................... 12

   I.     SUMMARY JUDGMENT STANDARDS ........................................... 12

   II.    APPLICABILITY OF THE "FEDERAL MOTOR CARRIER
         SAFETY REGULATIONS" TO THE PRESENT MATTER ................. 13

   III.   AN ANALYSIS OF *JORDAN v. CATES*, OR WHAT IT SHOULD
         BE CALLED...THE MOST MISQUOTED CASE IN OKLAHOMA ..... 16

   IV.   PLAINTIFFS NEGLIGENT *PER SE* CLAIMS ....................................... 17

   V.    PLAINTIFFS' RESPONSE TO DEFENDANT'S CLAIM FOR SUMMARY
         JUDGMENT ON THE ISSUE OF PUNITIVE DAMAGES ................... 18

         1.     EXAMPLES OF CASES AFFIRMING AWARDS OF PUNITIVE
              DAMAGES AGAINST DRIVER'S AND THEIR CARRIER'S ................. 25

CONCLUSION ........................................................................................................ 27

# TABLE OF CASES & AUTHORITIES
### (In the order of appearance)

## CASELAW

*Castillo v. Ridge*, 445 F.3d 1057 (8th Cir. 2006)............................................................12

*Gipson v. Immigration and Naturalization Service*, 284 F.3d 913 (8th Cir. 2002)......................12

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................12

*Davis v. U.S. Bancorp*, 383 F.3d 761 (8th Cir. 2004)....................................................13

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................................13

*Cassara v. DAC Services, Inc.*, 276 F.3d 1210 (10th Cir. 2002)....................................15

*Yellow Freight System, Inc. v. Amestoy*, 736 F. Supp. 44 (D. Vt. 1990) ........................15

*Jordan v. Cates,* 1997 OK 9, 935 P.2d 289 ...........................................................16-17

*Reed v. Fichencord*, 1923 OK 841, 219 P. 937 .....................................................18, 24

*Wooten v. Shaw*, 1951 OK 57, 237 P.2d 442...........................................................18, 24

*F.D.I.C. v. Moss,* 1991 OK 116, 831 P.2d 613 .............................................................18

*Mitchell v. Ford Motor Credit Co.,* 1984 OK 18, 688 P.2d 42........................................18-19

*Sopkin v. Premier Pontiac, Inc.*, 1975 OK CIV APP 47, 539 P.2d 1393 .......................19

*Hall v. Globe Life and Accident Ins. Co.*, 1998 OK CIV APP 161, 968 P.2d 1263 ...................19

*Weber v. Armco, Inc.*, 1983 OK 53, 663 P.2d 1221.................................................19-20

*Black v. M&W Gear*, 269 F.3d 1220 (10th Cir. 2001).............................................20-21

*Bierman v. Aramark Refreshment Services, Inc.*, 2008 OK 29, 198 P.3d 877 .......................21-22

*Sides v. John Cordes, Inc.*, 1999 OK 36, 981 P.2d 301 .........................................21, 24

*Dayton Hudson Corp v. American Mutual Liability Ins. Co.,* ......................................21

*Kurn v. Radencic,* 1943 OK 295, 141 P.2d 580.......................................................21, 24

*McDonald v. Bruhn*, 1942 OK 175, 126 P.2d 986.........................................................21

*Schuman v. Chatman,* 1938 OK 605, 86 P.2d 615 .......................................................21

*Holmes v. Chadwell*, 1934 OK 417, 36 P.2d 499 ....................................................21, 24

*Thiry v. Armstrong World Industries*, 1983 OK 28, 661 P.2d 515 ................................22

*Rodebush v. Oklahoma Nursing Homes, Ltd.*, 1993 OK 160, 867 P.2d 1241 ..............................24

*Russell-Locke Super-Service, Inc. v. Vaughn*, 1935 OK 90, 40 P.2d 1090 ...........................24

*Mangum Foods Inc. v. Continental Cas. Co.*, 36 F.3d 1491 (10th Cir. 1994)......................25

*Frierson v. Hines*, 1967 OK 60, 426 P.2d 362 ............................................................25

## OTHER AUTHORITIES

The Federal Motor Carrier Safety Act ..........................................................................................1

49 CFR § 382.303 ..........................................................................................................................1

49 CFR § 382.303(d)(1) ................................................................................................................1

49 CFR § 395.3(a)(1)-(2) ..............................................................................................................4

Title 47 O.S. § 11-1102 .................................................................................................................5

Title 47 O.S. § 11-404 ...................................................................................................................5

Title 47 O.S. § 11-704 ...................................................................................................................5

Title 47 O.S. § 11-901 ...................................................................................................................5

49 CFR § 383.31 ............................................................................................................................9

49 CFR § 383.5 ..............................................................................................................................9

49 CFR § 391.31 ..........................................................................................................................10

49 CFR § 395.3 ............................................................................................................................10

49 CFR § 395.8 ............................................................................................................................10

49 CFR § 383.51 – Tables 1 & 2 .................................................................................................11

49 C.F.R. § 390.3(a) ....................................................................................................................14

49 C.F.R. § 390.3(e) ....................................................................................................................14

49 C.F.R. § 390.11 .......................................................................................................................14

49 CFR § 390.3(a) ........................................................................................................................14

49 U.S.C. § 14101(a) ...................................................................................................................14

49 U.SC. § 14704(a)(2) ...............................................................................................................14

49 C.F.R. § 391.21(c) ..................................................................................................................15

49 C.F.R. § 383.51 .......................................................................................................................15

49 C.F.R. § 390.3(e)(1)&(2) ........................................................................................................15

OUJI 1.4 .......................................................................................................................................18

Title 23 O.S. § 9.1 .......................................................................................................................19

Title 47 O.S. § 6-307 ...................................................................................................................21

**DSMF #1-4:**        *Admitted.*

**DSMF #5:**        *Disputed. Objection, Immaterial and Irrelevant.* This alleged material fact

fails to either prove or disprove Defendant's request for summary judgment on the Plaintiff's claims

for punitive damages.  The Federal Motor Carrier Safety Act (hereinafter "FMCSR") regulations,

Title 49 CFR § 382.303 ("Post-Accident Testing"), mandate that a commercial driver **shall** test for

alcohol and drugs "as soon as practicable" (**which is 2 hours**) following a collision like the one

involved in this matter. It is undisputed that Defendant Richard Green was involved in a collision

with Plaintiff that required that mandated alcohol and drug testing, and that Defendant Green and

Defendant Service Transport Company (hereinafter "Defendant STC") violated this federal

regulation.

        According to § 382.303(d)(1) ("Alcohol Tests"), when a driver and company violate the 2-

hour rule, they must document the **reason(s) why** there was a violation, consider the following:

> "[I]f a test required by this section is not administered within *two hours*
> following the accident, the employer *shall* prepare and maintain on file a
> record *stating the reasons the test was not properly administered*."

        The form used to explain why the employee and/or employer violated the two (2) hour

deadline per FMCSR's is called a "Testing Exception Form."  It is undisputed that Defendant Green

***did not*** perform an alcohol test within the mandated two-hour time-frame…and the Defendant's

Corporate Representative conceded that the "Testing Exception Form" (**Exhibit 1**) required by the

rules ***did not state a reason*** why the test could not be completed in a timely manner.[1] Thus, not only

did Defendant Green and Defendant STC violate the two (2) hour rule, they also failed to document

the reasons why, which is a violation of the federal regulations on drug and alcohol testing.

---

[1]        At the time this Motion is filed, the deposition transcript of the Defendant's Corporate
Representative has not been completed and delivered.  Accordingly, Plaintiff will supplement this Motion
with the relevant portions of the deposition transcript when it becomes available.

More importantly, it is undisputed that **there is no documentation of the alcohol test results**, which happens to be yet another violation of FMCSR. A letter received from counsel for the Defendants (**Exhibit 2**) confirms that "***no written documentation is available***." Thus, the Defendant's representation that there was no alcohol in his system is based ***entirely*** on the Defendant's representation that they received "verbal 'negative results' was received from the lab."

In yet another twist, the Plaintiff directed a subpoena for drug and alcohol testing records to "Diagnostic Laboratory of Oklahoma" (hereinafter "DLO"), which was the lab identified in records related to the alleged collection of the drug and alcohol specimens from Defendant Green. The corporate office for DLO responded with the following (**Exhibit 3**):

RE: Request for Patient Records
Patient: Richard Green
DOB: ███████
Civil Action No. 16-cv-106-GKF-TLW

Dear Mortensen & Associates,

Per the subpoena for records on the above named patient, after an extensive search of our database no records were located.

The "Testing Exception Form" (**Exhibit 1**) shows a self-reported time of accident at 12:30 a.m., and that Defendant Green arrived at the clinic at 7:10 a.m. However, the actual federal drug testing form (**Exhibit 4**) indicates that a specimen was taken 40 minutes after his arrival at 7:50 a.m., which is approximately seven (7) hours after the collision.

Lastly, FMCSR regulations require that all controlled substances testing ***must*** be completed in a laboratory certified by the Department of Health and Human Services, as these approved laboratories have been rigorously inspected and tested and meet the highest standards for analytical competence. A list of certified laboratories is updated on a monthly basis, and current lists are printed in the Federal Register and are found on the Web at www.dot.gov/ost/dapc. Upon a review of the lists available for January of 2014, there is no indication that the lab listed on Defendant's

"Testing Exception Form" is an approved lab to conduct the type of testing mandated by FMCSR…which is probably why DLO doesn't have any records of Defendant Green's testing.

**DSMF #6-8:** *Admitted in Part, Disputed in Part. Objection, Immaterial, Irrelevant, and Speculative.* This alleged material fact fails to either prove or disprove Defendant's request for summary judgment on the Plaintiff's claims for punitive damages. Without waiving said objections, the Plaintiff states that a full and complete response to DSMF # 6-8 are included in the Plaintiff's Statement of Material Facts included below. As the response is lengthy, counsel for the Plaintiff believes in good faith that breaking the responses down into several smaller sections would provide counsel for the Defendant, and this court, with more clarity on the individual issues.

**DSMF # 9-11:** *Admitted.*

### PLAINTIFF'S STATEMENT OF MATERIAL FACTS ("PSMF's") THAT WOULD PRECLUDE DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

**PSMF #1:** On January 28, 2014, at approximately 10:30 am, Defendant Green logged into the "commercial motor vehicle" (hereinafter "CMV") owned by Defendant STC with the intent of beginning an interstate delivery of hazardous material from Houston, Texas, to Tulsa, Oklahoma (**Exhibit 1**: Driver's Logs at RFPD16). Defendant Green reached his destination in Tulsa, Oklahoma, at approximately 12:30 a.m., and then pulled into the private driveway of the business designated as his delivery location (*Id.* at RFPD18; **Exhibit 7**: Photo's of business driveway).

**PSMF #2:** Since the business delivery wasn't supposed to arrive until 8:00 a.m. (**Exhibit 5**: Bill of Lading), and the driveway was gated, Defendant Green began his logbook certification at 12:30 a.m. and post-trip inspection at 12:36 a.m. (**Exhibit 6**: Driver's Logs).

**PSMF #3:** The "Vehicle Inspection Report" conducted at 12:44 a.m. noted that there was no damage to the vehicle whatsoever…which is undisputed proof that the accident had not yet occurred at 12:44 a.m. (**Exhibit 8**: Vehicle Inspection Report).

**PSMF # 4:**    Since the gate wouldn't be opened until sometime later that morning, Defendant Green logged into his sleeper berth at 12:44 a.m. (**Exhibit 6.**).

**PSMF # 5:**    At some point in time between 12:44 a.m. and 12:59 a.m., Defendant Green decided to back out into the street at the same time that the Plaintiff was passing the driveway on her way home, which is evidenced by Defendant Green's phone call to 911 immediately following the accident at 12:59 a.m. (**Exhibit 4**: Phone Records of Defendant Green).

**PSMF # 6:** After being on the phone with 911 for approximately 8 minutes, the Defendant then called Defendant STC at approximately 1:09 a.m. (***Id.***).

**PSMF # 7:**    According to the FMCSR's, specifically, 49 CFR § 395.3(a)(1)-(2), a motor carrier shall not permit or require any employee to drive a CMV after the end of the 14-consecutive-hour period without first taking 10 consecutive hours off duty.  This safety rule was enacted to prevent tired and/or fatigued drivers from operating large semi-trucks and trailers on public roadways.

**PSMF # 8:**    Since Defendant Green first logged into his CMV at 10:30 a.m. on 1/28/14, he would **<u>not</u>** have been allowed to drive after 12:30 a.m. on 1/29/14.  When Defendant Green began backing out of the driveway at approximately 1:00 a.m., he was in violation of FMCSR § 395.3 regarding the 14-hour rule. Further, Defendant STC was aware, of should have been aware, of Defendant Green's violation of the FMCSR's as it relates to the rules prohibiting fatigued drivers from operating CMV's on public roadways.

**PSMF # 9:**    When Defendant Green backed out of the driveway and began turning his vehicle towards the same direction he turned into the driveway, he did so in violation of Defendant STC's own policies (**Exhibit** 5: Driver New-Hire Outline at RFPD2005-06) that advise the driver of the acronym "**G.O.A.L.**" – which stands for "**G**et **O**ut **A**nd **L**ook."  Although Defendant Green never mentions in his deposition that he got out of his vehicle to look…it's clear that he didn't.

**PSMF # 10:** Regarding the backing maneuver Defendant Green made, called a "Blind side backing (right side)", the company policy warns new drivers to "avoid (blind side backing) if at all possible", but if a driver absolutely has to, the driver must "**Always have a spotter.**" (*Id.*).

**PSMF # 11:** Notwithstanding the violation of his own company policies, Defendant Green also violated Oklahoma Statutes regarding his driving conduct:

> **Title 47 O.S. § 11-1102 ("Limitations on Backing"):**
> "No vehicle shall be backed upon any street or highway except for such distance **as may be necessary** to permit the vehicle to enter the proper driving lane from a parked position. Such backing shall be done **only after** the driver of said vehicle has ascertained that such movement can be made without endangering other traffic."

> **Title 47 O.S. § 11-404 ("Vehicle Entering Highway from Private Road or Driveway"):**
> "The driver of a vehicle about to enter or cross a highway from a private road or driveway shall yield the right-of-way to all vehicles approaching on said highway."

> **Title 47 O.S. § 11-704 ("Emerging from…Driveway…"):**
> "The driver of a vehicle within a business or residence district emerging from an alley, driveway… upon entering the roadway shall yield the right-of-way to all vehicles approaching on said roadway."

> **Title 47 O.S. § 11-901 ("Reckless Driving"):**
> "It shall be deemed reckless driving for any person to drive a motor vehicle in a careless or wanton manner without regard for the safety of persons or property…"

**PSMF # 12:** Although Defendant Green maintains that he "missed his turn" and was backing up and driving forward again, a review of the photographs (**Exhibit 7**) of the Defendant's vehicle at the time of the collision show he had more than enough room to enter – which makes the Defendant's version implausible. Moreover, the Defendant notes the Plaintiff stated at her deposition that the truck wasn't in the road when she was near the point of the collision, and that the "truck jumped in front of me" and "All I know is he was not in front of me. And then all of a sudden, he was."[2]

---

[2]  Defendant's Motion at Exhibit 4.

**PSMF # 13:**   The Defendants also argue that the reflective tape on the side of the trailer should have given a reasonable motorist adequate warning of the semi-truck's presence.   However, common sense would dictate that when the semi-truck is backing up from a driveway, the reflective tape wouldn't be visible until the truck is directly in front – or perpendicular – to the other motorist.

**PSMF # 14:**   At the time of the collision, Defendant Green was still towing a large tractor-trailer fully loaded with "TPC 1106 - Polyisobutylene", which was required to be kept at a constant temperature of 280 degrees Fahrenheit (**Exhibit 5**).   Further, Defendant Green testified that he was required to check on the temperature of the cargo at intervals, and that he checked on the trailer "once or twice" – however – there are **no records** of his interval checks (**Exhibit 13** at 70).

**PSMF # 15:**   It is undisputed that the collision caused the Plaintiff to incur substantial medical expenses, to include the costs associated with a surgery and having her mouth wired shut, along with a permanent scar located under her chin (**Exhibit 11**: Photo's of Plaintiff before and after the collision). Additionally, Plaintiff's vehicle was totaled (**Exhibit 12**: Photo's of Plaintiff's vehicle).

**PSMF # 16:**   Although Defendant STC's policy on "backing" requires its drivers to warn other motorists by using "hazard flashers while backing" (**Exhibit 10**), Defendant Green admitted in his deposition that he did **not** use his hazard flashers because the only signal he used to warn other motorists was "before the turn" – or when he was initially turning into the driveway (**Exhibit 13**: Defendant Green's Deposition at 18/23).

**PSMF # 17:**   Although Defendant denies ever crossing the yellow center-divider lines (*Id.* at pg.'s 18-23), the photograph at **Exhibit 7** clearly shows that Defendant Green's is incorrect.

**PSMF # 18:**   Although Defendant stated that he was backing up shortly before the collision with Plaintiff, he did *not know how far he backed up* (**Exhibit 13** at 16).   Further, Defendant Green did not know **how much time had elapsed** between when he decided to back up until the time of the collision with Plaintiff (**Exhibit 13** at 20).

**PSMF # 19:** It is undisputed that when a driver backs up out of a private driveway, and into a roadway, that any side/rear view mirrors are only going to show the driver what is directly behind him – and not what's coming down the roadway. Although Defendant Green testified that he checked for traffic at the time that he backed up, his <u>actual</u> testimony reflects that **he only checked his mirrors** (**Exhibit 13** at 13), consider the following:

```
 3           No cars were coming up or down the road.  No
 4 lights, no nothing.  When I made that turn, I still
 5 observed where my trailer tire would have came on the
 6 pavement.  I stopped the truck, backed it up, looking
 7 in both mirrors seeing that there is no traffic coming
 8 toward me and to the rear of me because the area is
 9 dark.  When I moved forward, that's when I heard the
10 hit.
```

**PSMF # 20:** On March 5, 2013, Defendant Green was cited while driving a CMV for Defendant STC in Conecuh County, Alabama for excessive speeding in a construction zone, specifically; going 65 mph in a 50 mph zone with construction workers present (**Exhibit 14**).

**PSMF # 21:** Regarding Defendant Green's excessive speeding in a construction zone ticket, he testified to the following: (1) that he paid the ticket "Because I didn't want to go through the legal hassles" (**Exhibit 13** at 42/14); (2) that he didn't believe that he was speeding (*Id.* at 43/17); (3) that he couldn't dispute the officer's account that he was going 65 mph in a 50 mph zone because "I didn't look at the speedometer." (*Id.* at 44/16); and, (4) that he can't remember whether there were construction workers present (*Id.* at 44/22).

**PSMF # 22:** Regarding the Alabama excessive speeding in a construction zone ticket, Defendant Green also testified that Defendant STC didn't talk with him or send him back for retraining or a driving school, and he didn't remember if Defendant STC docked his pay or had a safety meeting with him (**Exhibit 13** at 80: "I can't remember having a meeting.").

**PSMF # 23:**   Within a few months of the Alabama ticket, Defendant Green was again cited for a traffic violation on July 29, 2013, while driving for Defendant STC (**Exhibit 15**). This time, however, his "unsafe lane change" caused a collision with another vehicle traveling on a Highway.

**PSMF # 24:**   Regarding Defendant Green's conviction for unsafe lane change that caused a collision, he testified to the following: (1) that he disagreed with the officer giving him the ticket, as opposed to the other driver, and that he "went to fight it." (**Exhibit 13** at 52/6); (2) that the court had found him guilty of the offense and he paid the ticket (*Id.* at 47-48); and, (3) that when he went to fight the ticket at court, the court didn't believe him (*Id.*):

```
12      Q.    Did you go to court to fight that ticket?
13      A.    I did.
14      Q.    You did?
15      A.    Yeah.
16      Q.    And what happened as a result?
17      A.    They didn't believe anything I said.
18      Q.    Okay.  And what happened?  What did the court
19 do?
20      A.    I went to court to fight the ticket, but they
21 did not believe me on the lane change.
```

**PSMF # 25:**   Regarding Defendant Green's conviction for unsafe lane change that caused a collision, he testified that Defendant STC did not take any action against him, or reprimand him, take money away from him, sanction him, or otherwise send him for recertification or a driving school (*Id.* at 77-78).

**PSMF # 26:**   Interestingly, Defendant Green initially **denied** ever being given a ticket, or in a motor vehicle collision, while operating a CMV due to his failure to check his mirrors (much like the collision involved in this matter).  When confronted with the July 29, 2013, conviction for an unsafe lane change that caused a collision, Defendant Green finally admitted to the fact that he was convicted for the offense, but that he "objected" to the ticket. (**Exhibit 13** at 50-51).

**PSMF # 27:**  According to the FMCSR's, specifically, 49 CFR § 383.31, upon receiving a conviction for a traffic violation other than a parking violation, both the driver and employer "shall notify an official designated by the State of jurisdiction which issued such permit or license, of such conviction. The notification must be made within 30 days after the date that the person has been convicted."  Also, according to § 383.5 ("Definitions"), "Conviction" is defined as follows:

> *"Conviction* means an unvacated adjudication of guilt, or a determination that a person has violated or failed to comply with the law in a court of original jurisdiction or by an authorized administrative tribunal, an unvacated forfeiture of bail or collateral deposited to secure the person's appearance in court, a plea of guilty or nolo contendere accepted by the court, the payment of a fine or court cost, or violation of a condition of release without bail, regardless of whether or not the penalty is rebated, suspended, or prorated."

**PSMF # 28:**  Regarding this "duty to report" in conjunction with the FMCSR training of Defendant Green by Defendant STC, he testified that he was unaware if any of his traffic violations and/or crashes were reported to DOT or the Texas agency responsible for CDL licensing (*Id.* at 72-73 & 76).  In fact, Defendant Green testified that as a CDL license holder, he is only required to report his accident or traffic violations to his own company (*Id.* at 73).  This is clearly a violation of the federal regulations by both Defendant Green and Defendant STC.

**PSMF # 29:**  Regarding the FMCSR training of Defendant Green by Defendant STC, he testified that the only traffic violations under the federal regulations he is aware of is for D.U.I. and excessive speeding, but does <u>not</u> know what would happen to him if he was caught for excessive speeding. (*Id.* at 75). Defendant Green testified about the 11-14-hour rule previously discussed, specifically; that "It's up to the driver" to determine if you can drive the 11 hours straight (*Id.* at 92).

**PSMF # 30:**  Regarding Defendant Green's driver's logs up to the day of the collision, he testified that: (1) he logged his "pre-trip inspection" after he was through driving – which is a violation of the FMCSR's (*Id.* at 104); (2) that he **<u>did not know</u>** what the driver log time entries reflected (*Id.* at

105/22: "Q: What do these times reflect? Could you walk us through that?, A: That again, I can't say."); and, (3) that even with the driver's logs in front of him, he **did not know how long he was driving on 1/27/14** (*Id.* at 106-107).

**PSMF # 31:**   In a remarkable bit of testimony, Defendant Green actually admitted that he had *never* seen the printed driver's logs before, consider the following (*Id.* at 109):

```
16       Q.    Those columns that say, and they are marked
17 Delta, they are marked log time, they are marked
18 created time, I won't get into the other columns, but
19 this Delta, what does that mean?
20       A.    That again, I couldn't tell you.  I have
21 never seen the documents, the printed up documents.
22       Q.    You have never seen those before?
23       A.    No.
```

**PSMF # 32:**   Regarding the collision with Plaintiff, Defendant Green testified that Defendant STC gave him a different semi-truck to drive, and that the trip to Tulsa that resulted in the collision was the first and "**only time (the Defendant had) driven that truck**." (*Id.* at 115/6-11):

**PSMF # 33:**   Defendant Green testified that he didn't know what time of day the collision occurred on 1/29/14, but that he does not dispute that the collision occurred around 1:00 a.m. on 1/29/14 per the accident report taken by OHP (*Id.* at 118-119).

**PSMF # 34:**   Regarding whether Defendant Green violated the 14-hour rule, he testified that he has no evidence to support a finding that he didn't exceed the 14-hour driving time limit (*Id.* at 127)

**PSMF # 35:**   Defendant Green agreed that the driver was responsible for keeping all of the time-keeping records, but that he **never kept written documentation of his driver's logs** (*Id.* at 109). According to FMCSR §§ 391.31, 395.3, and 395.8, a motor carrier is obligated to conduct driver road testing, to regulate a driver's hours of operation, and to use specific methods to record a driver's "duty status."

**PSMF # 36:**   Defendant Green testified that had **never** been in trouble for falsifying driver's logs, and that he had **never** falsified any logs (*Id.* at 145-146).  However, records from Defendant STC show that he was, in fact, reprimanded for keeping false logs (**Exhibit 16**).

**PSMF # 37:**   According to Table 2 of § 383.51 ("Disqualification of Drivers for Serious Traffic Violations"), the March 2013 excessive speeding ticket, along with the July 2013 unsafe lane change ticket triggered the disqualification mechanisms under FMCSR and Defendant Green should have been immediately disqualified from operating any CMV for the periods of time listed in Table 2 (**Exhibit 17**).  Defendant Green, however, never took a period of suspension as a result of these "serious traffic violations" that included his at-fault collision with another vehicle.

**PSMF # 38:**   According to Defendant Green, his CDL license was finally suspended in 2016 (**Exhibit 13** at 24), however, this suspension was not in time to have prevented the collision with Plaintiff.

**PSMF #39:**   When Defendant Green turned in his employment application (**Exhibit 18**) with Defendant STC, he represented that he went to the "A-Class" truck driving school in Houston, Texas.  The truck driving school, however, was not aware of this fact, and responded to a subpoena request for records by stating, "We are not a school, we are a truck rental service that provides the trucks for the CDL Road Test." (**Exhibit 19**).

**PSMF #40:**   Further, Defendant Green represented on his employment application that he did **<u>not</u>** have any moving violations in the past three (3) years (**Exhibit 18** at RFPD811).   However, Defendant Green later admits that he was, in fact, given a "seat belt violation" within two (2) years of his employment application (**Exhibit 13** at 38; and **Exhibit 20**).  Also, Defendant Green originally listed the violation (**Exhibit 18** at RFPD811), but then attempted to redact the violation by placing a line through it.

**PSMF #41:**   A motor vehicle record ("MVR") check was submitted for Defendant Green on September 10, 2013, after he reported his traffic violation and collision to Defendant STC, which revealed that Defendant Green's motor vehicle record was "clear." (**Exhibit** 21). It is undisputed that as of at least the end of September of 2013, Defendant Green now had two (2) serious traffic violations, one (1) at-fault collision, while driving a vehicle for Defendant STC…which is undisputed proof that neither Defendant Green or STC reported the violations.

**PSMF #42:**   Although Defendant Green had at least three (3) serious traffic violations and two (2) collisions while employed, and should have been disqualified from driving under FMCSR regulations, Defendant STC nevertheless scored him a "meets requirements" on Defendant Green's annual review in August of 2014 (**Exhibit 22**).

**PSMF #43:**   Although there is an FMCSR requirement to immediately submit a written notification of any crashes and/or traffic violations to an employer, Defendant Green submitted his "Record of Violations" for the 1/29/14 collision with Plaintiff on 8/13/14, which was almost eight (8) months later (***Id.***).

## <u>ARGUMENTS AND AUTHORITIES</u>

## I.    SUMMARY JUDGMENT STANDARDS

Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, indicates there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Castillo v. Ridge*, 445 F.3d 1057, 1060 (8th Cir. 2006), citing *Gipson v. Immigration and Naturalization Service*, 284 F.3d 913, 916 (8th Cir. 2002). The summary judgment rule is intended "to isolate and dispose of factually unsupported claims" and should be applied to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-324 (1986). When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non- moving party bears the burden of proof at trial, the non-moving

party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted).

Thereafter, summary judgment is mandated against the non-moving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id*. at 322, 324-25. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Davis v. U.S. Bancorp*, 383 F.3d 761, 765 (8th Cir. 2004) (citation omitted). The Court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248.

## II.  APPLICABILITY OF THE "FEDERAL MOTOR CARRIER SAFETY REGULATIONS" TO THE PRESENT MATTER

Large commercial trucks, like the one involved in this matter, account for a disproportionate percentage of the injuries and deaths occurring on American roadways. The Federal Motor Carrier Safety Administration (hereinafter "FMCSA") conducted a study in which it gathered data from crashes involving large trucks between 2001 and 2003. The FMCSA reported that, during the 33-month study period, there were approximately 141,000 fatal or injury causing crashes involving large trucks.[3] According to the FMCSA's report, two-thirds of the crashes caused by large trucks were attributable to either the truck driver's: (1) failure to recognize a potential crash risk as a result of **inattention, distraction or failure to observe**; or, (2) the driver's poor decision-making such as

---

[3]  FMCSA, Report to Congress on the "Large Truck Crash Causation Study (2005)." http://ai.fmcsa.dot.gov/ltccs/data/documents/reportcongress_11_05.pdf.

driving too fast for conditions, following too closely, misjudging the speed of other vehicles or making incorrect assumptions about the other driver's actions.[4] An estimated 60% of the crashes caused by large trucks resulted from one of two types of driving failures—driving outside the truck's proper lane of travel or loss of control.[5]

The FMCSR's regulate and/or control motor carriers, drivers, and commercial motor vehicles, which transport property or passengers in interstate commerce. 49 C.F.R. § 390.3(a). With a few exceptions, every employer is required to be knowledgeable and comply with all regulations, to instruct all drivers and employees regarding applicable regulations, and to ensure that all motor vehicle equipment and accessories are maintained in compliance with applicable regulations. 49 C.F.R. § 390.3(e). Under the FMCSR, a motor carrier is required to ensure compliance with any duty or prohibition imposed upon its drivers by the regulations. 49 C.F.R. § 390.11. Further, the motor carrier's obligation or duty to ensure its drivers' compliance with the applicable FMCSR is non-delegable.

The requirements set out in the FMCSR's are broad and apply not only to the driver, but also to the motor carrier and the commercial motor vehicles which transport property or passengers in interstate commerce. 49 CFR § 390.3(a). Their regulatory effect places obligations on the carrier to properly hire, qualify, train, monitor, supervise, and direct their drivers. The FMCSR's are located at 49 C.F.R. § 390 *et seq.*, and the authority for the FMCSRs is found in the "Motor Carrier Act" (hereinafter "MCA"), which provides that "a motor carrier shall provide safe and adequate service, equipment, and facilities." 49 U.S.C. § 14101(a).

The FMCSR's set out the applicable **standard of care** to be followed in the industry, for example; the regulations provide that "A carrier…is liable for damages sustained by a person as a result of an act or omissions of that carrier…in violation of this part." 49 U.SC. § 14704(a)(2). The

---

[4]     *Id.* at pg. 12.
[5]     *Id.* at pg. 13.

FMCSR requirements also establish a **minimum standard of care** for the evaluation of driver qualifications. 49 C.F.R. § 390.3(d). These regulations may even require driver applicants to provide information in addition to that required to be disclosed by the regulations. 49 C.F.R. § 391.21(c) (2000). *Cassara v. DAC Services, Inc.*, 276 F.3d 1210, 1212, 1213 (10th Cir. 2002)("A motor carrier's duty to ensure that a driver is physically qualified is a continuing one."); see also *Yellow Freight System, Inc. v. Amestoy*, 736 F. Supp. 44, 48, 49, 50 (D. Vt. 1990)("A driver who is disqualified shall not drive a commercial motor vehicle.")

Applying the present matter to the FMCSR's is a critical task for summary judgment purposes, as the FMCSR's mandate that an, "employer shall not knowingly allow, require, permit, or authorize a driver who is disqualified to drive a commercial motor vehicle." 49 C.F.R. § 383.51. In fact, the FMCSR's mandate that every employer is knowledgeable of, and comply, with every regulation contained in the regulations that may apply to that company's operations, and that, "(E)very driver and employee shall be instructed regarding and shall comply with, all applicable regulations contained in this subchapter." 49 C.F.R. § 390.3(e)(1)&(2).

Ultimately, these regulations enforce the trucking company's duty to protect other motorists and pedestrians who share the road on a daily basis. The trucking company's continuing duty mandates obligatory monitoring of all drivers for compliance with the FMCSR. It is these duties that Defendants Green & STC were – as demonstrated by the PSMF's – violating on a weekly/monthly basis. But more importantly, it was these mandatory duties that led to the collision with Plaintiff, specifically: the rules prohibiting fatigued drivers from operating CMV's; the rules mandating proper record and time-keeping; the rules requiring drug and alcohol tests to be conducted within a certain timeframe; and, the rules prohibiting disqualified drivers from operating CMV's on public roadways.

## III.  AN ANALYSIS OF *JORDAN v. CATES*, OR WHAT IT SHOULD BE CALLED… THE MOST MISQUOTED CASE IN OKLAHOMA

The Plaintiff agrees, and always have, with Defendant's position that a Plaintiff can't bring separate individual claims against Defendant for negligent hiring, retention, supervision, or training due to Defendant's admission of agency.  The Plaintiff, however, disagrees that summary judgment is appropriate in this instance…due to the fact that Plaintiff **did not** raise those separate claims in her Petition. A review of the Petition reveals that Plaintiff filed three claims, specifically: (1) negligence against Defendant Green; (2) *respondeat superior* against Defendant STC; and, (3) negligence *per se* against both Defendants for the violations of Oklahoma law and federal laws (regulations) related to the trucking industry.

The Defendants contend that *Jordan v. Cates,* 1997 OK 9, 935 P.2d 289, stands for the proposition that, "once *respondeat superior* liability has been admitted, claims related to negligent hiring, retention, supervision, or training are 'unnecessary and superfluous.'"[6]  While the Plaintiff agrees that *Jordan* held that admitting agency prevents a plaintiff from proceeding on any other derivative or dependent liability theory, the Plaintiff would also note that the court specifically found that ***evidence*** of negligent hiring, retention, supervision, or training was still admissible at trial due to its relevance to the issue of punitive damages. Regarding the ***admissibility of evidence*** related to claims of NHRT, the court in *Jordan* held that, "Certainly, the evidence (of past conduct) was relevant to the issue of punitive damages under the remaining intentional tort theory of liability."[7]  Additionally, the court stated in the opening syllabus of the court's opinion that:

> The Court today holds: (1) where an employer stipulates an employee is acting within the scope of his employment when an altercation occurs ***and liability for punitive damages can be established under the respondeat superior doctrine***, the theory of negligent hiring imposes no further liability."[8]

---

6  See Defendant's Motion [Dkt.# 84] at pg. 5 (citing to *Jordan* at ¶ 16).
7  *Id.* at ¶ 19.
8  *Jordan,* at ¶¶ 0 & 21 (emphasis added).

Thus, if agency is admitted, <u>***and punitive damages are available***</u> under *respondeat superior*, then there would be no need to advance **separate and independent claims** for "Negligent Hiring, Retention, or Training" (hereinafter "NHRT")…or in other words:

> "Here, Shop-N-Save stipulated that the harm-dealing altercation during the course of Cates' employment and that employer would stand liable for damages (***including punitive damages***) if Cates was found guilty of battery."[9]

In *Jordan,* the plaintiff alleged he was physically assaulted by the manager of a convenience store called the "Shop-N-Save." The plaintiff sued the manager for "battery" (an intentional tort), and the corporation for NHRT. The corporation admitted the manager was acting within the course and scope of his employment, and then moved for summary judgment on plaintiff's NHRT claims. The trial court granted the request, which was affirmed by the Oklahoma Supreme Court on the basis that, "Oklahoma's jurisprudence also holds that punitive or exemplary damages may be awarded against the principal for a servant's act under the doctrine of respondeat superior."[10] Regarding *Jordan's* reasoning, the court held that:

> "Because vicarious liability can include liability for punitive damages, the theory of negligent hiring and retention imposes no further liability on employer."[11]

## IV. PLAINTIFFS NEGLIGENT *PER SE* CLAIMS

It appears that the Defendants failed to request summary judgment on Plaintiff's claim of Negligence *Per Se*, thus, it has been effectively waived. The Plaintiff, however, engages in a discussion found below of *per se* violations for purposes of responding to summary judgment on the issue of punitive damages.

---

[9]   *Id.* at ¶10.
[10]  *Id.* at ¶9.
[11]  *Id.* at ¶ 16.

## V.    PLAINTIFFS' RESPONSE TO DEFENDANT'S CLAIM FOR SUMMARY JUDGMENT ON THE ISSUE OF PUNITIVE DAMAGES

Defendant argues that Plaintiff does not have a valid claim for punitive damages because his actions were not *intentionally* accomplished with malice aforethought.  However, the question of punitive damages, where properly plead, is a question of fact for the jury if there is some evidence reasonably tending to support that issue. *Reed v. Fichencord*, 1923 OK 841, 219 P. 937. "Malice" is legally presumed where the defendant's conduct evidences a "conscious indifference to consequences." *Wooten v. Shaw*, 1951 OK 57, 237 P.2d 442. Clearly, Defendant's choices that day were intentional, reckless and accomplished with a conscious indifference to the consequences of a collision.  This is clear and convincing evidence.  It is ultimately not the trial court's job to weigh the evidence (*F.D.I.C. v. Moss,* 1991 OK 116, 831 P.2d 613), because ultimately, it's up to the jury to determine the facts of the case. OJUI 1.4.

In an effort to thwart Plaintiff's claims, the Defendants cite *Mitchell v. Ford Motor Credit Co.,* 1984 OK 18, 688 P.2d 42, in support of their position that there is no basis for punitive damages.  *Mitchell*, a 1984 case, is a case that <u>interprets the old punitive damages statute</u>.  The present statute applicable to this matter went into effect in 1995 and was lastly amended to its present form July 1, 2002. Contrary to the Defendants intended position, the Court in *Mitchell*, actually upheld the award of punitive damages on appeal due to a showing that "the jury could conclude from the evidence presented that the creditor not only was indifferent to the consequences of its actions, but also that its flawed work flow process demonstrated a reckless disregard for the rights of others."[12]  The Oklahoma Supreme Court in *Mitchell* went further to note that "evidence of reckless and wanton disregard of another's rights from which malice and evil intent <u>may be inferred</u>"[13] -and that this inference can come from a "complete indifference to consequences",

---

[12]    *Id.* at ¶ 9.
[13]    *Id.* at ¶ 8.

18

"conscious or reckless disregard of the safety of others" or even from "gross negligence".[14] It appears that the Oklahoma Supreme Court exercised caution in disturbing a jury verdict where that verdict, and the award of punitive damages, was supported by competent evidence.

Title 23 O.S. § 9.1 instructs us that a Defendant may be held liable for punitive damages *where the jury finds* by clear and convincing evidence that "(t)he defendant has acted intentionally or been guilty of reckless disregard for the rights of others." Also, as the Oklahoma Supreme Court suggested in *Sopkin v. Premier Pontiac, Inc.*, 1975 OK CIV APP 47, 539 P.2d 1393, whether the Defendant's conduct was intentional, malicious, oppressive, or sufficiently reckless to merit punishment should be a jury decision.

The Defendants next cite to *Hall v. Globe Life and Accident Ins. Co.*, 1998 OK CIV APP 161, 968 P.2d 1263, for the proposition that punitive damages, "is a question of law for the court."[15] This position is an overreaching misstatement of the case and inapplicable to the instant matter due, in part, to the fact that *Hall* involves a lawsuit against an insurance company for its purported failure to pay the proceeds of a life insurance policy. According to Title 12 O.S. § 9.1, the actions of an insurer in dealing with its insured are specifically delineated, and intentionally separated from other causes of action. Clearly, the present matter involves a motor vehicle collision and does not involve the Defendant's duty to "deal fairly and act in good faith".

In a strategic move to persuade this Court, the Defendants cite to *Weber v. Armco, Inc.*,[16] for the proposition that, "'Reckless disregard' is not to be confused with inadvertent conduct."[17] The Oklahoma Supreme Court in *Weber*, however, was dealing with a lawsuit regarding the liability of a manufacturer in a product liability case.

---

14      *Id.* at FN 8.
15      Defendant's Motion at pg. 9.
16      *Weber v. Armco, Inc.*, 1983 OK 53, 663 P.2d 1221.
17      Defendant's Motion at pg. 9.

In fact, the quote used by Defendants was not complete…and taken out of context.  Consider the following quote taken directly from the case – and is more complete than the Defendant's version:

> "The question of whether punitive damages may be awarded **in an action for products liability** was recently answered by this Court. In *Thirty v. Armstrong World Industries* we said:
>
>> 'Punitive damages may be assessed against the manufacturer of a product injuring the plaintiff if the injury is attributable to conduct that reflects reckless disregard for the public safety. **`Reckless disregard' is not to be confused with inadvertent conduct**. To meet this standard the manufacturer must either be aware of, or culpably indifferent to, an unnecessary risk of injury. *Awareness should be imputed to a company to the extent that its employee[s] possess such information.* Knowing of this risk, the manufacturer must also fail to determine the gravity of the danger or fail to reduce the risk to an acceptable minimal level. `Disregard for the public safety' reflects a basic disrespect for the interests of others.'"[18]

In yet another products liability case cited by the Defendants, *Black v. M&W Gear*, 269 F.3d 1220 (10th Cir. 2001), stands for the proposition that there "must have been a high probability that the conduct would cause serious harm to another."  *Black* was a products liability case – and contrary to the Defendant's position – actually held that the trial court erred in granting Defendant's motion, consider the following:

> "Plaintiff had an elevated burden: proof by clear and convincing evidence that Defendants were guilty of reckless conduct. *Nevertheless, a reasonable juror could have resolved that Plaintiff met this burden with the evidence presented*.  It was thus error for the district court to grant Defendant's motion for judgment as a matter of law on the issue of punitive damages."[19]

The 10th Circuit in *Black* considered evidence contained in the trial court's record that "Defendants were aware, or did not care, that there was a substantial and unnecessary risk that [its] conduct would cause serious injury to others."  This evidence was based on the showing that the Defendants were aware of a "rollover" problem with its lawnmowers – yet failed to install a

---

[18]     *Weber* at ¶ 13.
[19]     *Black*, 269 F.3d at 1240.

rollover protective structure and provide consumers with adequate warnings. The 10th Circuit regarded the issue of punitive damages as a jury question as long as there was some evidence tending to show the Defendant's reckless disregard for others.

Although the Defendant's request for summary judgment appears to only apply to Defendant Green ("Here, Green was attempting a turn with no other vehicles visible"[20]), the disqualifying traffic violations and prior at-fault collision attributed to Defendant Green should invoke independent punitive liability on Defendant STC for its knowledge of that conduct. Consider the following language found in Title 47 O.S. § 6-307 ("Liability for Knowingly Permitting the Operation by a Person Not Qualified"):

> "Any person as herein defined, who is the owner of any motor vehicle and knowingly permits such motor vehicle to be operated by any person who is not qualified to operate a motor vehicle under the provisions of this act, shall be held civilly liable as a joint tortfeasor for any unlawful act committed by such operator."

Additionally, Oklahoma law is clear about vicarious punitive exposure for an employer for the actions of an employee. For example, the Oklahoma supreme court has repeatedly held that, "Punitive or exemplary damages may be assessed against an employer for an employee's act under the doctrine of respondeat superior.[21] There is no requirement that an employer participate in or ratify the conduct of an employee to be liable for punitive or exemplary damages under the doctrine of respondeat superior."[22] Accordingly, any arguments advanced in Defendant's anticipated reply brief that would now include Defendant STC, the Plaintiff would respectfully request that the Court consider the cited authority, along with the statutes and violations of the FMCSR's, and attribute the related violations to Defendant STC as well.

---

[20]    Defendant's Motion at pg.'s 9-10.
[21]    *Bierman, supra,* at ¶ 19 (citing to *Jordan v. Cates, supra,* at ¶ 9; *Sides v. John Cordes, Inc., supra,* at ¶ 15 fn. 16; *Dayton Hudson Corp v. American Mutual Liability Ins. Co., supra,* at ¶ 13 fn. 19; *Kurn v. Radencic,* 1943 OK 295, ¶¶ 6-7, 141 P.2d 580; *McDonald v. Bruhn,* 1942 OK 175, ¶ 8, 126 P.2d 986; *Schuman v. Chatman, 1938 OK 605,* ¶ 19, 86 P.2d 615; *Holmes v. Chadwell,* 1934 OK 417, ¶ 8, 36 P.2d 499.
[22]    *Id.*

Moreover, federal law, as contained within the FMCSR, imposed numerous duties upon Defendant STC related to hiring, training, and entrustment of its vehicles. The federal regulations preempt any state laws that contain a standard of care less than that mandated by federal regulations. Defendant STC's arguments, taken to its logical conclusion, would result in immunity for trucking companies from any actions related to negligent hiring, training and entrustment claims so long as it admits the driver was its employee at the time the negligence occurred. This result is contrary to Oklahoma (and federal) law and public policy, and would frustrate the complex regulatory system enacted by the federal government to regulate the trucking industry in this country. Indeed, it would destroy the deterrent effect of federal neglect hiring legislation.

The Oklahoma Supreme Court neatly summarized the role of punitive damages in civil actions in the matter of *Thiry v. Armstrong World Industries*, 1983 OK 28, ¶ 24, 661 P.2d 515:

> "Unlike the purpose of compensatory damages which are to benefit the individual plaintiff, punitive damages are imposed to benefit society. The plaintiff acts as a private attorney general to punish the culpable wrongdoer, thereby encouraging adherence to safety standards that benefit consumers generally. Punitive damages should not primarily be used to obtain a windfall for the individual plaintiff. Although an action for punitive damages must be brought by a plaintiff who has been actually injured by the defective product, it is not the plaintiff's individual right, but society's as a whole, that is being defended."

Additionally, the court in *Thiry* discussed the recovery of punitive damages against an employer, consider the following:

> "In Oklahoma, punitive damages recovery is imposable vicariously. A ***principal individual or corporate*** may be made answerable in punitive damages for those offending acts done within the general scope of employment by an employee no matter what his level of responsibility in the company's organization which would serve to justify an exemplary damages award against the employee as an individual tortfeasor."[23]

---

[23]     *Thiry* at ¶ 9.

The Oklahoma Supreme Court in *Bierman v. Aramark Refreshment Services, Inc.*, 2008 OK 29, ¶¶ 19-20, 198 P.3d 877, held that a trial court should heed caution when striking claims for punitive damages, consider the following:

> "Under Oklahoma law, an employer may be held vicariously liable for the punitive damages arising out of an employee's act if: 1) a master/servant relationship exists between the employer and employee; and 2) the act was committed while the employee was acting within the scope of employment. ***Punitive or exemplary damages may be assessed against an employer for an employee's act under the doctrine of respondeat superior***. There is ***no requirement*** that an employer participate in or ratify the conduct of an employee to be liable for punitive or exemplary damages under the doctrine of *respondeat superior*.
>
> Here, it had already been established that the employee was liable for punitive damages and that the doctrine of *respondeat superior* was applicable to the employer. The trial court struck the injured party's claim based on an erroneous view of Oklahoma law on liability for punitive damages through *respondeat superior*. The trial court's ruling prevented the injured party from seeking punitive damages, affecting a substantial right. Therefore, the trial court abused its discretion by striking the claim, and the injured party's claim for punitive damages should have been presented to the jury."

Further, the court in *Bierman* reiterated that an employer may have exposure to an award of punitive damages based on the agency relationship it has with an employee, especially when the evidence shows that the employee's actions were deserving of an award of punitive damages, consider the following:

> "It is undisputed that the employee was assessed punitive damages for causing the accident. It is also undisputed that the employee was employed by the employer at the time of the accident. That the employer is liable for the accident under the doctrine of *respondeat superior* is the law of the case. Oklahoma law provides that an employer may be liable for punitive damages through the doctrine of *respondeat superior*. The trial court abused its discretion by refusing to submit the issue of punitive damages to the jury in the second trial based on its incorrect reading of Oklahoma law."[24]

The law in Oklahoma regarding punitive damages being awarded against a principal or employer has been well established, specifically; punitive damages may be assessed against a

---

[24] *Bierman* at ¶ 27.

principal or employer for the acts of its agents or employees if the agent or employee is acting within the scope of his or her employment. *Rodebush v. Oklahoma Nursing Homes, Ltd.*, 1993 OK 160, 867 P.2d 1241; *Sides v. John Cordes, Inc.*, 1999 OK 36,981 P.2d 301; *Russell-Locke Super-Service, Inc. v. Vaughn*, 170 Okl. 377, 40 P.2d 1090, 1094 (Okla. 1935); *Holmes v. Chadwell*, 169 Okl. 191, 36 P.2d 499, 500 (Okla. 1934) (employer may be liable for punitive damages without a showing that the employer ratified the act of the employee). *Jordan v. Cates*, *supra* 1997 OK at ¶9 ("Liability in such cases is based upon the doctrine of respondeat superior"); *Kurn v. Radencic*, 193 Okl. 126, 141 P.2d 580, 581.

Defendant argues that Plaintiff does not have a valid claim for punitive damages because Defendant Green's actions were not *intentionally* accomplished with "malice" aforethought. However, the question of punitive damages, where properly plead, is a question of fact for the jury if there is some evidence reasonably tending to support that issue.[25] "Malice" is legally presumed where the defendant's conduct evidences a "conscious indifference to consequences."[26]

Clearly, this is not an "unfortunate" and/or "unavoidable" accident – as the Defendant proclaims – but the result of a driver of a semi-truck who ignores the weight and length of his vehicle and the time it would take to slow his vehicle before creating an impassable obstruction in the roadway. This is not "inadvertence", this is a reckless driver who ignored the possibility of other motorists when he was backing into the roadway.

In the present case, in the ten (10) months that preceded the collision with Plaintiff, Defendant Green had noticeably and openly shown that he makes reckless decisions when operating his semi-truck, which was also known to put other drivers in jeopardy. More importantly, Defendant STC had a duty to employ drivers who demonstrate safe driving habits, but instead, made the intentional and reckless decision to entrust Defendant Green with a large semi-truck that

---

[25]     *Reed v. Fichencord*, 1923 OK 841, 219 P. 937.
[26]     *Wooten v. Shaw*, 1951 OK 57, 237 P.2d 442.

carries hazardous material on interstate roadways. "The duty to hire employees who are competent *and not dangerous* is, by its very nature, a duty of a master or employer, and this duty is nondelegable." *Mangum Foods Inc. v. Continental Cas. Co*., 36 F.3d 1491, 1500 (10th Cir. 1994).

Moreover, Defendant STC ignored these duties and the very policies that were designed to prevent this very type of incident. Those choices were both intentional and reckless. Both Defendants actions combine to display a conscious disregard for the rights of other motorists on the road that day as the Defendants had made several conscious decisions that were indifferent to the safety of others and/or showed a "complete indifference to those consequences."

While the Defendants wants this court to rely on their assertion that Defendant Green's driving behavior was unintentional and the mere result of inadvertent conduct (while backing blindly into the roadway), the matter of credibility of a witness ultimately lies peculiarly within the jury's province. *Frierson v. Hines*, 1967 OK 60, 426 P.2d 362. That is to say…it is for the jury to determine if Defendant Green's conduct was reckless and done with a conscious disregard for the rights of other motorists. It is for the jury to determine if Defendant Green backed into a roadway without first ascertaining whether his driving would affect and/or harm other drivers and ultimately, whether such conduct was in reckless disregard for the rights of other motorists. It is for the jury to determine if Defendant's failure to pay attention was intentional and in a reckless disregard for the rights of other motorists.

1.      **EXAMPLES OF CASES AFFIRMING AWARDS OF PUNITIVE DAMAGES AGAINST DRIVER'S AND THEIR CARRIER'S**

The following trucking cases involve decisions where punitive damages were either allowed to go to the jury or awarded. The inclusion of these cases is intended to provide a canvas of analogous factual situations which support a request for punitive damages.

- *Johnson v. ASK Trucking*, No. 09-4058, 2011 WL 1114247 (C.D. Ill. March 25, 2011) (Punitive damages question for jury where driver had multiple prior traffic violations and several violations of F.M.C.S. Regulations and company failed to provide adequate safety training to correct driver's poor record);

- *J.B. Hunt Transport Inc. v. Bentley*, 427 S.E.2d 499 (Ga. Ct. App. 1993) (Punitive damages awarded where testimony established driver swerved erratically and failed to slow down in construction zone);

- *Medlin v. Clyde Sparks Wrecker Serv., Inc.*, 59 F.App'x 770 (6th Cir. 2003) (Punitive damages awarded where tow truck driver ***left tow truck protruding*** onto busy highway and driver failed to radio police or erect warning signs);

- *Torres v. North American Van Lines, Inc.* 658 P.2d 35 (Ariz. App. 1983) (Punitive damages appropriate where driver consistently failed to properly log driving time permitting an inference of driver's deliberate attempt to avoid 70-hour rule);

- *Achey v. Crete Carrier Corp.*, No. 07-cv-3597, 2009 WL 101843 (E.D. Pa. Jan. 14, 2009) (Punitive damages request allowed to go to jury where driver consciously operated his tractor trailer while knowingly fatigued due to poor sleep and driver fell asleep to cause accident);

- *Elbar, Inc. v. Claussen*, 774 S.W.2d 45 (Tex. App. 1989) (Punitive damages award appropriate where company policies resulted in fatigued driving and fatal accident caused by fatigued driver's improper lane change was reasonably foreseeable consequence of policy);

- *Wang v. Marziani*, 885 F.Supp. 74 (S.D.N.Y. 1995) (Punitive damages question for jury where compensation schemed based on hours logged incentivized operation of truck in excess of F.M.C.S. Regulations – also – Punitive damages question for jury where company failed to sufficiently monitor driver activity and driver failed to secure cargo, falsified log books, and operated truck in excess of 70 hours in eight days resulting in fatal accident);

- *McAchran v. Knight Transportation*, 2009 WL 888539 (Az. Ct. App. April 2, 2009) (Punitive damages submitted to jury where company's compensation scheme compensated driver by the mile and company knew driver falsified logs but failed to take remedial action – also – Punitive damages submitted to jury where trucking company maintained skeletal staff to monitor drivers at night and early morning hours even though these were high risk accident periods).

- *Came v. Micou*, No. 4:04-cv-1207, 2005 WL 1500978 (M.D. Pa. June 23, 2005) (Punitive damages question for jury where fatigued driver in violation of hours of service limits caused accident and company lacked effective procedures to monitor and prevent hours of service violations);

- *Ditzler v. Wesolowski*, No. 3:2005-325, 2007 WL 2253596 (W.D. Pa. Aug. 3, 2007) (Punitive damages question for jury where driver's commercial driving record was clean but company failed to check driver's non-commercial driving record prior to employment, company only provided eight hours of driver training, and motor carrier safety director

testified he would not hire driver based on information in non-commercial records);

- *Trotter v. B & W Cartage Co.*, No. 05-cv-0205, 2006 WL 1004882 (S.D. Ill. April 13, 2006) (Punitive damages question for jury where driver repeatedly falsified logbooks, violated F.M.C.S.R. hours of operation limits and company inaction created situation where violations were likely to occur).

WHEREFORE, premises considered, the Plaintiff respectfully requests that this Court deny summary judgment on Defendant's arguments as a legitimate dispute as to the material facts exists on the issue of punitive damages.

Respectfully Submitted,


   /s/ Thomas Mortensen
Thomas Mortensen, OBA # 19183
1331 S. Denver Ave.
Tulsa, OK 74119
(918) 392-9992
(918) 392-9993 - Fax
tmort70@hotmail.com
*and,*
Patrick L. Adams, OBA # 19302
Adams Law Office, PLLC
525 S. Main, Suite 525
Tulsa, OK 74103
(918) 587-8700
patrick.adams@padamslawok.com
*Attorneys for Plaintiff*

## CERTIFICATE OF DELIVERY

This is to certify that on December 19, 2017, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

John R. Woodard, III: john@csmlawgroup.com
David T. Fletcher: dfletcher@csmlawgroup.com
*Attorneys for Defendant Service Transport Company*


   /s/ Thomas Mortensen
